IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TAMMEY DENEAU,                  :
                               :
      Plaintiff,                :
                               :
vs.                            :   CIVIL ACTION NO. 11-00455-B
                               :
ORKIN, LLC, *et al.*,           :
                               :
      Defendants.               :

<u>ORDER</u>

This case is before the Court on Plaintiff Tammey Deneau's motion for partial summary judgment (Doc. 87) and Defendants' motion for partial summary judgment (Doc. 91). Both motions have been exhaustively briefed and are now ripe for disposition. After carefully considering the foregoing, and other relevant materials in the file, the Court concludes, for the reasons set forth herein, that Plaintiff's motion for partial summary judgment is **DENIED**, and Defendants' motion for partial summary judgment is **GRANTED**.

## I. <u>Background</u>[1]

Orkin is a pest control company that provides termite and

---

[1] In resolving these motions, the Court construes the evidence and the factual allegations in the light most favorable to the non-moving party. <u>See</u> <u>Skop v. City of Atlanta</u>, 485 F.3d 1130, 1136 (11th Cir. 2007); <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999) (providing that when ruling on a motion for summary judgment, the court "should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").

pest control services to commercial and residential customers throughout the United States. (Doc. 92 at 30; Doc. 104-1 at 1). During the periods relevant to this case, Orkin was organized into five divisions, namely Atlantic division, Midwest division, Pacific division, South Central division, and Southeast division. (Doc. 104-1 at 1). Each division is subdivided into regions which in turn include several branches. (Id.). During 2010, the Mobile branch was part of the Louisiana-Mississippi region, and the region manager was James Earl Thomas.[2] (Doc. 92-34 at 1).

Plaintiff, who is a female, began working for Defendant Orkin as a Pest Control Inspector at Orkin's Mobile, Alabama branch in 1992. (Doc. 87-4 at 2). Plaintiff later worked in various office positions for Orkin including as a customer specialist and scheduler.[3] (Doc. 92-15 at 16). In 1998, Plaintiff became the office manager of the Mobile branch. (Id.).

During December 2009, Orkin received an "Ethics and Compliance Employee Hotline" call regarding alleged improprieties at the Mobile branch. (Doc. 98-3 at 1; Doc. 92-33

[2] The Louisiana-Mississippi region fell within the South Central division.

[3] Except during a brief period early on in which Plaintiff was assigned to Panama City, Florida, she worked out of the Mobile branch. (Doc. 92-15 at 16).

at 26). The South Central division auditing team manager assigned a division auditor, namely Donna Orr, to audit petty cash and payroll at the Mobile branch. In her audit, Orr determined that while the petty cash was in balance, there were violations of the petty cash policy including that receipts were not maintained in the branch. (Doc. 98-3 at 1; Doc. 92-11 at 37). Orr also determined that payroll errors had resulted in underpayment to employees and that Plaintiff had improperly used vacation or sick time to earn more than eight hours in a day.[4] (Id.).

Orr reported her findings to Elaine Cole, the auditing team manager, and to Thomas, the region manager. (Id.; Doc. 92-33 at 26; Doc. 92-34 at 1). Thomas consulted with Larry Black, the division human resources manager, and made the decision to issue Plaintiff a written Coaching and Counseling Discipline. (Doc. 92-33 at 27). In the Coaching and Counseling discipline dated January 21, 2010, Plaintiff was advised as follows:

> Tammey will abide by all company policies including the following: As custodian of the petty cash Tammey is responsible for maintaining the petty cash fund according to the procedures listed in GOP Vol II. Tammey will not take employees to lunch.

---

[4] The Hotline complaint also involved allegations regarding the improper handling of chemicals at the branch. (Doc. 92-11 at 37). Larry Black, the human resources manager for the South Central division, and Thomas, the region manager, investigated but were unable to confirm the allegations regarding the chemicals. (Id.).

Tammey will not reimburse any receipt out of petty cash until the Branch Manager signs his approval. Tammey will work the preapproved schedule which has been set by the Branch Manager.  The schedule is from 8 am to 5 pm each day except Tuesday.  On Tuesday the schedule is from 7 am until 4 pm.  Tammey will take a 1 hour lunch break each day.  Tammey will not work overtime unless it is approved in writing from the Region Admin and the Branch Manager.  Tammey will not report more than eight hours in a work day. . . .

Tammey will adhere to the expected level of performance/conduct as outlined above or further disciplinary action will be taken up to and including job termination.

(Doc. 91-25 at 1).  Thomas, in his role as the region manager,

along with Jason Breakfield, the Mobile branch manager, met with

Plaintiff to review the write-up with her.[5]  (Doc. 92-15 at 45).

In September 2010, Plaintiff notified Breakfield of her

interest in entering Orkin's branch manager trainee ("BMT")

program[6] and of being promoted.  (Doc. 92-15 at 33-36).

Breakfield relayed Plaintiff's interest to Thomas, who in turn

---

[5]  In her deposition, Plaintiff indicated that Jennifer Naquin, a regional administrative person, also sat in on the meeting. (Doc. 92-15 at 45).

[6]  Each region is allowed to have one or two BMTs, who are enrolled in Orkin's formal management development program. (Doc. 104-1 at 1).  The BMT program normally takes about a year to complete, and a trainee goes through training in the field and training classes before graduating from the program.  (Doc. 87-6 at 6).  It can take longer than a year to progress to a branch manager position if there are no branch manager openings available at the time that a trainee graduates from the program. (Id.).  Orkin has a total of seventy-four branches and seventy-four branch managers.  (Id.).  Out of those seventy-four branch managers, two are female.  (Id.).

requested that Black, the division human resources manager, arrange for Plaintiff to take Orkin's Helms online profile.   The Helms profile is an evaluation tool used by Orkin to determine whether an individual is suited for a particular job.   (Id.; Doc. 87-5 at 9-11; Doc. 92-12 at 5).   Plaintiff took the Helms tests and made the highest possible score on the branch manager trainee test and on the test for the service manager trainee positions, receiving a ten out of ten on both tests.  (Doc. 87-5 at 9; Doc. 92-15 at 34-35).

After learning of Plaintiff's Helms scores, Thomas offered to place Plaintiff in the management development program as a service manager trainee and to have her serve as acting service manager in the Mobile branch.  (Doc. 92-34 at 5; Doc. 92-15 at 36-37).   Plaintiff declined Thomas' offer and chose instead to focus on locations outside of Mobile.[7]  (Doc. 92-15 at 37; Doc. 92-34 at 5).

Plaintiff applied for, or expressed an interest in, Orkin branch manager/trainee positions in Missouri, Kentucky,

---

[7] Plaintiff testified that she declined the offer for several reasons including that she did not feel comfortable working with Frank Goodwin, and she did not feel that she could be successful in a management position in Mobile where she would always be thought of as an administrative person.  (Doc. 87-4 at 6-7; Doc. 92-33 at 18).  In addition, she felt that she would be working much longer hours without a significant difference in pay. (Doc. 87-4 at 6).

Virginia, and Tennessee.[8] (Doc. 92-34 at 5; Doc. 87-4 at 5; Doc. 87-5 at 3-4). The position in Independence, Missouri (located in the Kansas-Missouri region) was not filled until 2012 due to personnel issues involving several branch managers in the region. (Doc. 92-12 at 6). Two male applicants, Chris Enright and Christopher Mount, were selected for the two Kentucky region branch manager trainee positions. (Doc. 92-30 at 1-3). Tim Brady, a male, was selected for the branch manager trainee position in Virginia (Atlantic Commercial region). (Doc. 98-1 at 2).

In December 2010, the regional audit manager, Elaine Cole, assigned Donna Orr to perform another audit of the Mobile branch because that branch was to be reassigned from the Louisiana-Mississippi region to the Mid-South region. (Doc. 98-3 at 2-3). Orr arrived at the Mobile branch on December 13, 2010 and began the audit. (Id.). In the course of the audit, Orr discovered that the branch had missed five deposits in November. Upon reporting this to Cole, Orr was directed to audit the deposits for the entire year. (Id.). Orr found that the branch had not made daily deposits on sixty-nine separate days in 2010. Orr

---

[8] Plaintiff maintains that she applied for, or expressed an interest in, any open branch manager/trainee positions in Tennessee. (Doc. 105 at 7-8, 19). However, as discussed *infra*, the evidence shows that there were no openings at the time that Plaintiff expressed an interest. (Doc. 91-20 at 1; Doc. 92-12 at 8).

also found that Plaintiff had accrued overtime and had used sick or vacation time to accumulate more than eight hours per day. (Id. at 3).  The branch received an rating score of 2.29 which equates to "needs improvement."[9]  (Id.).

   Orr relayed her findings to James Earl Thomas, the region manager.  (Id. at 2).  Thomas, in consultation with Larry Black, the division human resources manager, made the decision to terminate Plaintiff due to repeated violations of the overtime policy despite a previous warning and serious breaches of the deposit policy.  (Doc. 92-34 at 7; Doc. 92-33 at 22-23, 34, 44; Doc. 92-11 at 15, 23).  Thomas advised Plaintiff of the decision to terminate her by telephone on December 23, 2010.[10]  (Doc. 92-33 at 31).  At that time, Thomas was aware that Plaintiff had recently posted a message on her Facebook page[11] inquiring about

---

[9] In addition to the administrative operations, the audit also covered other operations in the Mobile branch. (Doc. 92-33 at 30).  Deficiencies documented in the audit were not confined to the administrative area; however, Plaintiff was the only employee disciplined as a result of the audit.  (Id.).  According to Thomas, he did not discipline Jason Brakefield, who had served as branch manager during a portion of 2010 and was then serving in a regional sales position.  Thomas discussed the audit findings with Brakefield for training purposes.  (Id.).

[10] Thomas traveled to Mobile to terminate Plaintiff on December 22, 2010; however, she called in sick on December 21 and December 22, 2010.  (Doc. 92-12 at 11).

[11] It appears that on December 16, 2010, Plaintiff posted the following message on her Facebook page: "anyone know a good EEOC lawyer? need one now." (Doc. 105-1 at 3, 5-6).

"a good EEOC lawyer."[12]   (Doc. 92-34 at 9).

## II. <u>DISCUSSION</u>

### A.    <u>Standard of Review</u>

It is well-established that summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id.</u> at 322-24.

---

[12] According to Plaintiff, she had also complained to Frank Goodwin, the Mobile branch manager, in October and November 2010, that she believed that she was being denied promotions because she is a female. (Doc. 105-1 at 3). However, there is nothing in the record suggesting that Goodwin relayed her comments to either Black or Thomas.

> Once the moving party has met its burden,
> Rule 56(e) "requires the nonmoving party to
> go beyond the pleadings and by [its] own
> affidavits, or by the 'depositions, answers
> to interrogatories, and admissions on file,'
> designate 'specific facts showing that there
> is a genuine issue for trial.'" Id. at 324.
> To avoid summary judgment, the nonmoving
> party "must do more than show that there is
> some metaphysical doubt as to the material
> facts." Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 586, 106
> S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On
> the other hand, the evidence of the
> nonmovant must be believed and all
> justifiable inferences must be drawn in its
> favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 2013 U.S.
Dist. LEXIS 28034, *5-7, 2013 WL 765314, *1-2 (S.D. Ala. Jan.
29, 2013) (citations omitted).

The factual disputes raised by the nonmoving party must be
both material and genuine. "As to materiality, the substantive
law will identify which facts are material. Only disputes over
facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment. Factual disputes that are irrelevant or unnecessary
will not be counted." Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986). "'Genuine disputes are those in which
the evidence is such that a reasonable jury could return a
verdict for the nonmovant. For factual issues to be considered
genuine, they must have a real basis in the record.'" Mize v.
Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)

(citations omitted)).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  ThyssenKrupp, 2013 U.S. Dist. LEXIS 28034 at *5-7, 2013 WL 765314 at *1-2.

> **B.  Plaintiff's Motion for Partial Summary Judgment on Title VII Violation – Failure to Promote to Branch Manager Trainee Position in Independence, Missouri**

Plaintiff has filed a motion for partial summary judgment on her Title VII promotion claim based on Defendant Orkin's failure to promote her to the branch manager trainee position in Independence, Missouri.  (Docs. 87, 88, 118).  For the reasons set forth below, Plaintiff's motion for partial summary judgment is **DENIED**.

The complainant in a Title VII case must carry the initial burden of establishing a *prima facie* case of discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (U.S. 1973).  This may be done by showing that the plaintiff belongs to a protected class under Title VII; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) that, after her rejection, the position remained open, and the employer continued to seek applicants from persons of complainant's qualifications or that the

position was filled by a person outside the protected class. See id.; see also Walker v. Mortham, 158 F.3d 1177, 1180 n.2 (11th Cir. 1998). Once Plaintiff has made this showing, the burden then shifts to the Defendant employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. "If the employer meets this burden, the plaintiff must show that the proffered reasons were pretextual." Springer v. Convergys Customer Management Group Inc., 509 F.3d 1344, 1347 (11th Cir. 2007) (citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id.

Having reviewed the evidence submitted by the parties in this case, the Court finds that Plaintiff has satisfied her burden with respect to the first three elements of her *prima facie* case. However, the Court finds that Plaintiff has failed to submit evidence that, after her rejection for the branch manager trainee position in Independence, Missouri, the position remained open, and Defendant continued to seek applications from persons with complainant's qualifications or, alternatively, that the position was filled by a person outside the protected class to which the plaintiff belongs.

Indeed, the only material evidence submitted by the parties on this issue is the deposition and affidavit testimony of Larry Black, the senior human resources manager for the South Central division of Orkin.[13]   In his deposition taken on September 20, 2012, Black testified that he was aware that in September 2010, a branch manager trainee position came open in one of the regions in his division, specifically in Independence, Missouri. (Doc. 87-5 at 4-5).   Black was asked, "do you know who filled the position," and he responded, "No, sir."   (Id. at 4).   When asked if he knew the region manager who might have been the hiring decision-maker for that job, he answered, "Darren Dougherty."   (Id. at 5).   Black was then asked if he "ever talked to [Darren Dougherty] with regard to his decision to fill that position in Independence, Missouri," and he responded, "I do not remember a specific conversation with Darren about the position." (Id.).

Black later acknowledged that he talked to Dougherty shortly after Plaintiff submitted her application for the position and that he had communicated to Dougherty the fact that Plaintiff had scored a ten on the Helms test for both the service manager trainee and the branch manager trainee positions.   (Id. at 8-9).   However, when asked, "you don't know

---

[13] As noted *supra*, the Independence, Missouri region was located within the South Central division.

12

then what, if anything, Mr. Dougherty did in response to her or in relation to her application," he responded, "I do not." (Id. at 8).

In her brief in support of her motion for partial summary judgment, Plaintiff offers Black's deposition testimony to establish the fourth element of her *prima facie* case, that is, that the trainee position in Independence, Missouri remained open after she was rejected, and Orkin continued to seek applications from other persons with her qualifications. Specifically, Plaintiff argues:

> There is no evidence that the position was filled in 2010. (Black Depo., pp. 72). Black, testifying on behalf of Orkin, could not identify anyone who filled the position in 2010. (Black Depo., pp. 72). However, the Branch Manager Trainee program is continuous. (Ehlers Depo., pp. 29-30). Hence, it is undisputed that, although Deneau was rejected, the position remained open and Orkin continued to seek applicants, in conformity with its usual practice.

(Doc. 88 at 9).

Contrary to Plaintiff's argument, Black's deposition testimony does not establish that Daugherty rejected Plaintiff's application and continued to look for other applicants. Indeed, in a subsequent affidavit dated October 29, 2012, Black further testified that Dougherty had "received several resumes [for the 2010 Independence, Missouri branch manager trainee program], but he did not interview anyone" because he "had personnel issues

13

involving several Branch Managers in the Region, and ultimately did not hire a BMT until 2012." (Doc. 92-12 at 6). Thus, while Plaintiff is correct that the 2010 Independence, Missouri trainee position was not filled in 2010, there is no evidence that Dougherty rejected anyone for that position or that he continued to accept applications for that position. Rather, the evidence suggests that Dougherty abandoned his search for applicants in 2010 because he had to deal with more pressing personnel issues involving his branch managers. When he finally turned his attention back to the program in 2012, Plaintiff was no longer employed with Orkin.[14]   Therefore, because Plaintiff has failed to present evidence that Dougherty rejected her for the 2010 Independence, Missouri trainee position and that he continued to seek other applicants for that position, she has failed to establish her *prima facie* case.

Assuming *arguendo* that Plaintiff met her *prima facie* burden with respect to this claim, Defendant has articulated a legitimate, nondiscriminatory reason for not giving Plaintiff

---

[14]  The Court rejects Plaintiff's argument that because Orkin's trainee program was "continuous" and other region managers (in other parts of the country) were placing candidates into open trainee positions in their regions in 2010, the Court should construe the Independence, Missouri position as remaining open and continuing to accept applications in 2010. (Doc. 88 at 9). Even assuming Plaintiff's allegations as true, those facts do not suggest that Darren Dougherty rejected Plaintiff's application for the 2010 for the Independence, Missouri position and continued to seek other applicants.

the Independence, Missouri branch manager trainee position, and Plaintiff has failed to present evidence suggesting that the proffered reason is a pretext for discrimination.   Without question, Larry Black's affidavit testimony that Dougherty did not fill the Independence, Missouri trainee position in 2010 because he was dealing with personnel issues involving his branch managers is a legitimate, nondiscriminatory reason for not giving the position to Plaintiff (or anyone) when she applied in September of 2010.

In her reply brief, Plaintiff does not dispute this evidence, but she argues that the Court should not consider Black's affidavit testimony on this issue because the affidavit directly contradicts his previous 30(b)(6) deposition testimony that he did not know the reason that "Ms. Deneau was not considered" for the branch manager trainee position in Independence, Missouri in 2010.   Plaintiff argues that the subsequent affidavit is a sham and as such should be disregarded. (Doc. 118 at 9-10).   The Court disagrees.

While this Court has the authority to strike an affidavit that contradicts previously given deposition testimony without providing an explanation for the apparently contradictory assertions, Lane v. Celotex Corp., 782 F. 2d 1526, 1529-30 (11th Cir. 1986), doing so would be inappropriate in this case. "[E]very discrepancy contained in an affidavit does not justify

15

a district court's refusal to give credence to such evidence."
Id. at 1530 (internal quotation marks omitted).  Only an
affidavit that is "inherently irreconcilable" with earlier
testimony should be stricken.  Tippens v. Celotex Corp., 805 F.
2d 949, 954 n.6 (11th Cir. 1986).  See also Croom v. Balkwill,
645 F. 3d. 1240, 1253 n.18 (11th Cir. 2011) ("A definite
distinction must be made between discrepancies which create
transparent shams and discrepancies which create an issue of
credibility or go to the weight of the evidence.") (citation
omitted); Latimer v. Roaring Toyz, Inc., 601 F. 3d 1224, 1237
(11th Cir. 2010) (sham affidavit rule "is applied sparingly
because of the harsh effect it may have on a party's case," and
applies only where there is an "inherent inconsistency between
an affidavit and a deposition"); Akins v. Fulton County, 278
Fed. Appx. 964, 968 (11th Cir. 2008) ("We apply the sham
affidavit concept to limited circumstances and thus, every
discrepancy contained in an affidavit does not justify a
district court's refusal to give credence to such evidence")
(citation and internal quotation marks omitted).

In Black's deposition, he was asked, "does Orkin, the
defendant in this case, have a reason why Ms. Deneau was not
considered for that position," and he responded, "I do not
know." (Doc. 87-5 at 6) (emphasis added).  He was then asked
again, "do you know what the reason is, if any, that the company

16

had for not considering Ms. Deneau [for] that position," and he responded, "I do not know." (Id.) (emphasis added). In Black's later affidavit, he advised that Darren Dougherty, the hiring region manager, did not interview anyone for the position because he had to turn his attention to personnel issues involving other branch managers in his region. Unlike the deposition questions which specifically asked for a reason that Orkin did not consider *Plaintiff* for the position, Black's affidavit testimony supplements his earlier deposition testimony and explains why the position was not offered to anyone in 2010 or the following year. Stated differently, Black's subsequent affidavit offers a much broader explanation, not personal to Plaintiff, as to why the position was not filled until 2012. For that reason, Black's affidavit testimony does not "flatly contradict" his previous deposition testimony that he did not know why *Plaintiff* may not have been considered for the position. See Akins, 278 Fed. Appx. at 968. Because Black's affidavit in this instance does not directly or flatly contradict his earlier deposition testimony, it does not constitute a sham. Id. Thus, Plaintiff's argument for disregarding the affidavit testimony is without merit.[15]

---

[15] In addition to Larry Black's affidavit, the parties have filed a number of motions to strike other affidavits in this case as well. The Court is addressing those motions by separate order.

17

Having found that Plaintiff has failed to establish a *prima facie* case of discrimination related to the Independence, Missouri branch manager trainee position and, further, that assuming a *prima facie* case, Plaintiff has failed to present evidence demonstrating that Defendant's legitimate, nondiscriminatory reason for not awarding Plaintiff the branch manager trainee position is a pretext for discrimination, Plaintiff's motion for partial summary judgment is **DENIED**.

### C.   Defendants' Motion for Partial Summary Judgment

Defendants Orkin, Goodwin, and Mayfield-Duke have filed a motion for partial summary judgment on Plaintiff's Title VII promotion claim (First Cause of Action), Title VII retaliation claim (Second Cause of Action) and state law defamation claim (Fourth Cause of Action).  (Docs. 91, 100, 121).  For the reasons set forth below, the Court finds as follows:

Defendants' motion for partial summary judgment as to Plaintiff's Title VII claims asserted against individual Defendants Goodwin and Mayfield-Duke is **GRANTED**; Defendants' motion for partial summary judgment as to Plaintiff's promotion claims (First Cause of Action) is **GRANTED**; Defendants' motion for partial summary judgment as to Plaintiff's Title VII-retaliation claim (Second Cause of Action) is **GRANTED**; and Defendants' motion for partial summary judgment as to

Plaintiff's state law defamation claim (Fourth Cause of Action) is **GRANTED.**

### 1. No Title VII Liability Against Individual Defendants Goodwin and Mayfield-Duke

In her Amended Complaint, Plaintiff asserts her Title VII promotion and retaliation claims (First and Second Causes of Action) against individual Defendants Goodwin and Mayfield-Duke, as well as against her former employer, Orkin. The law is clear that individuals cannot be held liable under Title VII. _See Fodor v. D'Isernia_, 2013 U.S. App. LEXIS 2650, *3, 2013 WL 461226, *1 (11th Cir. 2013) ("individual employees are not subject to liability under either Title VII or the ADA"); _Busby v. City of Orlando_, 931 F.2d 764, 772 (11th Cir. 1991)("The relief granted under Title VII is against the _employer_, not individual employees whose actions would constitute a violation of the Act) (emphasis in original). Thus, Defendants' motion for partial summary judgment on Plaintiff's Title VII claims against individual Defendants Goodwin and Mayfield-Duke is **GRANTED.**

### 2. Failure to Exhaust Administrative Remedies

As discussed above, in her Amended Complaint, Plaintiff alleges two Title VII claims against Orkin: (1) sex discrimination in failing to promote Plaintiff into a management position (First Cause of Action); and (2) termination of

employment in retaliation for complaints to management about sex discrimination (Second Cause of Action). (Doc. 34 at 5-6). In its brief in support of motion for partial summary judgment, Orkin argues that it is entitled to summary judgment on both of these claims because Plaintiff did not exhaust her administrative remedies with the EEOC. (Doc. 100 at 20-23). The Court disagrees.

"In order to file a judicial complaint under Title VII, a plaintiff must first administratively exhaust any claims by filing a charge with the EEOC." Francois v. Miami Dade County, Port of Miami, 432 Fed. Appx. 819, 821 (11th Cir. 2011). (unpublished) (citations omitted). "[T]he scope of [a] judicial complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Id. "[J]udicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint," but "allegations of new acts of discrimination are inappropriate." Gregory v. Georgia Dep't of Human Res., 355 F.3d 1277, 1279-80 (11th Cir. 2004) (internal quotation marks omitted). Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." Id., 355 F.3d at 1280 (citations omitted). The Eleventh Circuit has noted that "'the scope of an EEOC complaint should not be strictly interpreted.'" Id. (citations omitted).

20

In the present case, it is undisputed that Plaintiff completed and signed an unverified EEOC Intake Questionnaire on March 28, 2011, stating that she believed that she had been discriminated against by her employer, Orkin, on the basis of "sex" and "retaliation." (Doc. 105-13 at 2). Then, on May 1, 2011, Plaintiff timely filed a verified Charge of Discrimination with the EEOC alleging that Orkin had discriminated against her on the basis of her sex.[16] (Doc. 92-5 at 1). Plaintiff checked the box labeled discrimination based on "sex," and in the narrative portion of the form, she stated that she was "terminated because of [her] sex." (Id.). In addition, Plaintiff stated that Orkin discriminated against her on the basis of her sex by failing to promote her to open branch manager positions in the company and by making her train her replacement as a pre-condition to promotion. While Plaintiff did not check the box labeled "retaliation", she did assert that her complaints of retaliation and harassment were ignored. (Id. at 2).

---

[16] The EEOC issued a Dismissal and Notice of Rights letter on May 10, 2011, informing Plaintiff that based upon its investigation, it was unable to conclude whether a violation had occurred and that she had the right to sue within ninety days of receipt of the notice. (Doc. 92-6). Plaintiff filed the present action on August 8, 2011. Defendant does not dispute the timeliness of any of Plaintiff's filings.

Having carefully reviewed Plaintiff's EEOC charge and her intake questionnaire, the Court is satisfied that EEOC's investigation of the facts alleged in Plaintiff's EEOC charge and questionnaire would have reasonably encompassed the failure to promote and retaliation claims contained in her Amended Complaint. <u>Cf.</u> <u>Gregory</u>, 355 F.3d at 1279-80 (despite the fact that the plaintiff failed to mark the box on her EEOC charge labeled "retaliation," her retaliation claim was exhausted because the facts alleged in the charge were "inextricably intertwined" with the retaliation claim and, thus, could reasonably be extended to encompass the retaliation claim.). In <u>Gregory</u>, the Eleventh Circuit stated:

> [U]nder the liberal EEOC charge strictures of <u>Sanchez</u>, we hold that the district court did not err in finding that [Plaintiff's] retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form. The facts alleged in her EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination. That is, she stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation because of her complaints of Dr. Fuller's disparate treatment to the hospital's administration. Specifically, shortly after being subjected to certain allegedly discriminatory acts, she was terminated. An EEOC investigation of her race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation.

<u>Gregory</u>, 355 F.3d at 1280.

Similarly, in the present case, Plaintiff alleged in her EEOC charge that she was denied promotions based on her sex, that she was terminated because of her sex, and that she had complained to management about harassment and retaliation. (Doc. 92-5 at 1-2). A reasonable EEOC investigation would have encompassed her claims that she was denied promotions due to her sex, and was terminated in retaliation for complaining about sex discrimination. Based on the foregoing, the Court finds that Plaintiff's Title VII claims do not exceed the scope of her EEOC charge. Accordingly, Defendant's motion for partial summary judgment on this ground is without merit.[17]

3. **Plaintiff's Title VII—Failure to Promote Claims (First Cause of Action): No *Prima Facie* Case and Legitimate, Non-Discriminatory Reasons for Failure to Promote**

---

[17] Defendant also argues that Plaintiff's Title VII-promotion claim (First Cause of Action) related to the branch manager trainee program in Independence, Missouri should be dismissed because denial of promotion into that specific program was not alleged in Plaintiff's Amended Complaint. (Doc. 100 at 23). <u>See</u> <u>Davis v. Coca-Cola Bottling Co.</u>, 516 F.3d 955, 974 (11th Cir. 2008) (affirming dismissal of some of plaintiffs' promotion claims where the complaint alleged discrimination based on race but did not allege each denied promotion of which plaintiffs were aware at the time that they filed their complaint). However, having found herein that Defendant is entitled to summary judgment on this claim on the basis of Plaintiff's failure to establish a *prima facie* case of discrimination and failure to rebut Defendant's evidence of a legitimate, non-discriminatory reason for rejecting her application to this position, the Court need not decide this issue.

As part of her Title VII-promotion claim (First Cause of Action), Plaintiff claims that Defendant Orkin denied her promotions in four different regions of the Orkin company for which she either specifically applied or made known her interest to the relevant decision-maker: (1) the Kansas-Missouri region (Independence, Missouri); (2) the Kentucky region (Pikeville and Lexington, Kentucky); (3) the Atlantic Commercial region (Virginia); and (4) the Mid-South region (Tennessee). (Doc. 105 at 15-19). Orkin seeks summary judgment on each failure to promote claim on the basis that Plaintiff has failed to establish a *prima facie* case of discrimination and/or that Plaintiff has failed to rebut Orkin's legitimate, nondiscriminatory reason for not selecting Plaintiff for the positions. The Court addresses each of these claims in turn.

### (a). <u>Kansas-Missouri Region (Independence, Missouri)</u>

Having addressed the Independence, Missouri claim above in relation to Plaintiff's motion for partial summary judgment and having found that Plaintiff failed to establish a *prima facie* case of discrimination with respect to the Independence, Missouri branch manager trainee program and has presented no evidence to rebut Orkin's evidence of a legitimate, nondiscriminatory reason for not filing the position in 2010 and

2011,[18] the Court **GRANTS** Defendant Orkin's motion for partial summary judgment on the Independence, Missouri Title VII-promotion claim.

### (b). <u>Kentucky Region (Pikeville and Lexington)</u>

Next, Plaintiff alleges that she was rejected for the acting branch manager/trainee positions in Pikeville and Lexington, Kentucky. (Doc. 105 at 16-17). According to Plaintiff, she was rejected for a posted branch manager/trainee program position in Pikeville, Kentucky, which was given to a male applicant, Chris Enright, and for a similar, unposted position in Lexington, Kentucky, which was given to a male applicant, Christopher Mount. (<u>Id.</u>; Doc. 92-19 at 19-20, 28). Orkin agrees, for purposes of its motion, that Plaintiff has presented a *prima facie* case with respect to each of these claims because Plaintiff can show that she is a female, that she applied for these positions for which she presumably was minimally qualified, that she was rejected, and that the positions were filled by male applicants. (Doc. 100 at 24).

---

[18] As discussed above, Plaintiff does not dispute Larry Black's affidavit testimony that Darren Daugherty, the Kansas-Missouri region manager, did not fill the trainee position in Independence, Missouri in 2010 or 2011 because Daugherty was dealing with personnel issues involving several of his branch managers. (Doc. 92-12 at 6). This is a legitimate, non-discriminatory reason that has not been controverted.

However, Orkin maintains that it can articulate a legitimate, nondiscriminatory reason for both decisions.

### (i). Pikeville, Kentucky Claim

With respect to the Pikeville, Kentucky position, Orkin maintains that Chris Enright was selected for the branch manager trainee position because the trainee would immediately become an *acting* branch manager, and as such, the person filling that position needed prior management experience. According to Defendant, Chris Enright possessed such prior management experience, but Plaintiff did not. (Doc. 92-30 at 1-3). The evidence supports Defendant's assertion.

In his affidavit, Ron Stotts, who was the Kentucky region manager and decision-maker for this position, stated that in the fall of 2010, he learned that the Pikeville branch manager would be leaving at the end of the year, and he immediately started to search for a replacement. (Id. at 1). Stotts stated that he wanted to hire from within the company, and he asked Meribeth Ehlers, the human resources manager for the Midwest division, to advertise in the company's internal job application process, "Career Connections." (Id.). According to Stotts, he preferred branch manager trainee candidates with two years or more prior sales or service management experience, and candidates who had demonstrated their ability to problem solve (both customer problems and insect problems), who had

26

demonstrated that they could meet budgets, and who had been successful in their current position. (Id. at 1-2). Stotts believed Orkin service managers and Orkin sales managers were good candidates for branch manager trainee positions because they had experience working with people, inventorying, ordering materials and supplies, and handling customer issues and treatment issues. (Id. at 2). In addition, service managers had already completed several of the classes which were required for branch managers. (Id.). According to Stotts, "[b]asically, Service Managers have already done most of the Branch Manager job, but with a little less intensity." (Id. at 2).

Stotts recalled receiving many applications for the Pikeville position, but most of the applicants did not have a management background. (Id.). He remembers calling Ehlers when he received Plaintiff's application because the company was working to increase the number of female managers. (Id.). Stotts remembered asking Ehlers if Plaintiff had management experience, and Ehlers told him that "it looked like she did not." (Id.). He then asked Ehlers to call Plaintiff and verify whether she had management experience. In a few days, Ehlers reported back that Plaintiff did not have management experience. (Id.). Stotts never spoke to Plaintiff personally. (Id.). Because the branch manager trainee at the Pikeville branch would immediately become responsible for managing the branch as acting

branch manager, Stotts felt that the person "definitely needed management experience." (Id.). Therefore, he selected Chris Enright, who at that time was employed as the service manager in Orkin's Alsup, Illinois branch. (Id.). Stotts enrolled Enright in the branch manager trainee program and named him acting branch manager of the Pikeville branch effective January 1, 2011. (Id. at 3). Based on this evidence, Orkin maintains that it is entitled to summary judgment on this claim.

Plaintiff acknowledges Defendant's evidence but argues that it is a mere pretext for discrimination. In support of her pretext argument, Plaintiff states that she was an office manager for eighteen years in the Mobile branch and that her office manager position was also a management position. (Doc. 105 at 17). Plaintiff points to the deposition testimony of Donald Richards, the region manager for the Atlantic Commercial region, who stated that an office manager is "in a management position." (Doc. 92-28 at 21). Plaintiff also claims that, as office manager of the Mobile branch, her responsibilities at times included all of the branch manager and service manager duties. In her affidavit, Plaintiff states:

> As the only Office Manager at the Mobile Branch, I was responsible for all of the day-to-day operations. During a majority of the time, the Mobile Branch did not have a Service Manager and I was required to perform those managerial duties as well. . . . Furthermore, my Branch Manager, Jason

28

> Breakfield, was usually absent from the
> office, leaving me to perform his duties and
> run the branch.

(Doc. 105-1 at 1). Plaintiff also states that during her employment as office manager, she completed several training courses that were management level training courses. (Id. at 2; Doc. 105 at 5).

"When deciding a motion by the defendant for judgment as a matter of law in a discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Id. (citations and internal quotation marks omitted). "The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. (citations and internal quotation marks omitted). However, "[a] legitimate nondiscriminatory reason proffered by the employer is not a

pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley v. City of Lilburn, 408 Fed. Appx. 248, 251 (11th Cir. 2011) (unpublished).

Having carefully considered the evidence presented by the parties in this case, the Court finds that Plaintiff's evidence of pretext has not cast sufficient doubt on Orkin's proffered nondiscriminatory reason for rejecting her for the Pikeville, Kentucky position to create a dispute of material fact on this issue. Assuming, as Plaintiff claims, that as office manager of the Mobile branch, she was called upon to perform many of the duties of the service and branch managers when those individuals were not available, that experience is still not the type of formal managerial experience that Ron Stotts undisputedly was seeking when hiring for the Pikeville branch manager position. Moreover, Plaintiff has not shown that Stotts was aware that she sometimes performed the duties of the service and branch managers in the Mobile branch. Rather, Stotts testified in his affidavit that he asked Ehlers if Plaintiff had managerial experience, and Ehlers told him no. Stotts then hired Chris Enright who undisputedly had formal experience as a service manager in another branch prior to being promoted to acting branch manager and branch manager trainee in the Pikeville branch.

"Eleventh Circuit precedent makes clear that where an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff." Seldon v. Total Sys. Servs., Inc., 653 F. Supp. 2d 1349, 1373 n.27 (M.D. Ga. 2009) (citations and internal quotation marks omitted). Because Plaintiff has failed to present such evidence or to otherwise cast sufficient doubt on the defendant's proffered nondiscriminatory reasons for rejecting Plaintiff for this position, Defendants' motion for partial summary judgment on the Pikeville, Kentucky Title VII-promotion claim is **GRANTED**.

### (ii). Lexington, Kentucky Claim

Next, Plaintiff claims that Orkin discriminated against her on the basis of her sex by denying her an unposted acting branch manager/trainee position in the Lexington branch, which was awarded to Chris Mount, a male. (Doc. 105 at 17). Orkin maintains, to the contrary, that a short time after the Pikeville branch manager announced that he would be leaving, the branch manager in the Lexington branch unexpectedly announced his retirement. (Doc. 92-30 at 3). At that time, Chris Mount was the service manager in the Lexington branch. (Id.). Ron Stotts, the region manager and decision-maker for this position as well, stated in his affidavit that Mount had been with Orkin

31

since 1992 and had been the service manager at the Lexington branch since 1998. (Id.). For those reasons, Stotts decided to place Mount in the branch manager trainee program and selected him for the acting branch manager position. (Id.). Stotts explained that he did not post or advertise the position because he felt that Mount was "a very good fit for the job." (Id.). Stotts further stated that he "would not have passed over Chris Mount to hire someone with less experience" to be Mount's supervisor. (Id.).

Plaintiff does not contradict this evidence but argues that it should not be considered because Stotts was not designated as a 30(b)(6) designee for promotions in this region and, further, that since Plaintiff was never considered for the Lexington position, Defendant cannot use her qualifications as a reason for not hiring her. (Doc. 105 at 18-19). The Court disagrees.

Plaintiff argues that Maribeth Ehlers, the human resources manager for the Midwest division/Kentucky region, was the only person designated as a 30(b)(6) corporate representative for promotions for this region; thus, the Court should not consider Stott's testimony on this issue. However, Elhers' deposition made clear that both she and Stotts were involved in the hiring process in this region, with Ehlers serving in an information-gathering and advisory capacity and Stotts serving as the decision-maker. (Doc. 92-19 at 8-10, 17, 28; Doc. 92-30 at 1-

32

3).   Ehlers  testified  at  length  regarding  the  hiring  process  in

both  the  Pikeville  and  Lexington  branches  and  Stotts'  goal  of

hiring  individuals  with  formal  management  backgrounds  for  both

of  those  positions.   (Doc. 92-19 at 8-10, 17, 28).   While  Orkin

failed  to  designate  Stotts  as  an  additional  30(b)(6)  deponent

for  hiring  decisions  in  this  region,  its  failure  to  do  so  does

not  render  his  affidavit  inadmissible  given  that  Ehlers'

testimony  covered  this  topic  and  is  consistent  with,  and  to  a

large  extent  cumulative  of,  Stotts'  affidavit.[19]

Furthermore,  Plaintiff's  reliance  on  Joshi v. Florida State

Univ. Health Ctr.,  763  F.2d  1227,  1235  (11th  Cir.  1985),  is

misplaced.   The  Eleventh  Circuit  has  noted  that  "where  a

defendant  did  not  consider  the  qualifications  of  the  candidate

from  the  protected  class  at  the  time  of  making  the  employment

decision,  it  cannot  later  assert  as  a  nondiscriminatory  reason

the  superior  qualifications  of  the  candidate  actually  promoted."

Springer v. Convergys Customer Mgmt. Group, Inc.,  509  F.3d  1344,

1348  (11th  Cir.  2007)  (citing  Joshi,  763  F.2d  1227).   The

Springer  court  distinguished  Joshi,  however,  finding  that  "[i]n

Joshi,  the  defendant  had  no  prior  knowledge  of  Joshi's

qualifications  because  Joshi  was  not  an  employee  of  the

defendant.   Joshi  was  an  outside  applicant."   Id.   Although

---

[19]  It  is  also  noteworthy  that  nothing  in  the  record  reflects  that
Plaintiff  was  somehow  prevented  from  deposing  Stotts.

there was evidence that the plaintiff in Springer was not considered for the promotion at issue, the plaintiff had worked for the defendant corporation for a number of years, and the decision-maker at issue had direct knowledge of the plaintiff's qualifications, performance, and deficiencies which led her to believe that the plaintiff should not be considered for the position.  Id.

The Court finds this case more analogous to Springer than to Joshi.  As set forth above, the evidence in this case is undisputed that both Plaintiff and Chris Mount worked for Orkin. Plaintiff worked in the Mobile branch as the office manager, and Chris Mount worked in the Lexington branch as the service manager.   At the time of the branch manager opening in Lexington, Chris Mount was already in place in that branch, and he possessed the formal management experience (as a service manager) that Ron Stotts, the region manager, was seeking. While Plaintiff claims that as an office manager she too had management experience, it is undisputed that she never formally served in the capacity of either a service manager[20] or a branch manager (which was what Stotts was seeking) and that Stotts was

---

[20]  As discussed above, at the same time that Plaintiff was seeking branch manager and trainee positions in Missouri, Kentucky, Virginia, and Tennessee, she was offered the service manager position in the Mobile branch but turned it down because she did not want to work in the Mobile office.  (Doc. 87-4 at 6-7; Doc. 92-33 at 18-19).

unaware that Plaintiff sometimes assumed the duties of the service and branch managers when they were unavailable.

"[W]here an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff." <u>Seldon</u>, 653 F. Supp. 2d at 1373 (citations and internal quotation marks omitted). Because Plaintiff has failed to present such evidence or to otherwise cast sufficient doubt on Orkin's proffered nondiscriminatory reasons for rejecting Plaintiff for this position, Defendants' motion for partial summary judgment on the Lexington, Kentucky Title VII-promotion claim is **GRANTED**.

### (c). <u>Atlantic Commercial Region (Virginia)</u>

Next, Plaintiff claims that she was discriminated against on the basis of her sex with respect to an unposted branch manager trainee position in the Atlantic Commercial (Virginia) region that was given to a male applicant, Tim Brady. (Doc. 105 at 19). Plaintiff asserts that Brady had no prior experience in the pest control business; yet, he was chosen over her for the trainee position. (<u>Id.</u>). Orkin counters that Plaintiff's claim must fail because the region manager for the Atlantic Commercial region, Don Richards, had already made the decision to fill the trainee position with Tim Brady *before* he ever received

Plaintiff's application.   (Doc. 121 at 9-10).   In response, Plaintiff asserts that Richards' claim that he had already decided to hire Brady for the position by the time he received Plaintiff's application is false because "[Richards] received Deneau's application in mid-September and . . . hired Brady in late September or early October." (Doc. 105 at 19). Notwithstanding Plaintiff's assertions to the contrary, there is nothing before the Court that suggests that Richards' legitimate reason is pretextual.

The evidence reflects that in September 2010, Tom Cafiero, another branch manager, advised Richards that Plaintiff might be interested in speaking with Richards about a position in his region.   Richards told Cafiero "that [Plaintiff] would need to follow the proper procedures and talk with her immediate supervisor and then apply through the career connections. . . and go through the proper protocols before [Richards] could speak with her." (Doc. 92-28 at 11-12).   Subsequent thereto, Plaintiff completed an application, dated October 4, 2010, for a branch manager trainee position in the Atlanta Commercial region. (Doc. 92-28 at 18; Doc. 91-4).

Richards testified that he does not recall the exact date that he received Plaintiff's application package, and that his best judgment is that it was "within about a week or two after" October 4, 2010 (the date on the application). (Doc. 98-1 at 2-

36

3).  According to Richards, by the time he received Plaintiff's package, he did not have an opening in the management development program because he had just hired Tim Brady, and his region was only allocated one BMT trainee.  (Id. at 3). Richards had previously considered Brady for a region sales position advertised during the summer of 2010.  Although Richards did not choose Brady for the sales position, he met with Brady regarding the BMT position on October 6, 2010; he had Brady complete his pre-employment drug screening on October 7, 2010; and he sent Richards a formal offer letter on October 11, 2010.[21]  (Id. at 2 n.1).

Although Richards did not have a BMT opening when he received Plaintiff's application package, he was interested in Plaintiff because her qualifications "looked good;" she was highly recommended by one of his branch managers, Tom Cafiero; and the company was working to increase the number of females in the company.  (Id. at 3).  According to Richards, because of Orkin's emphasis on hiring women, he thought he might be able to get approval for two BMTs, and even if he was not successful in getting approval, he could keep Plaintiff in mind for future openings because she seemed "well qualified."  (Id.)

---

[21]  Richards testified that the drug screening (along with a physical) constitutes a "conditional offer of employment" and is "the final step" in the hiring process.  (Doc. 92-28 at 6-7).

During November 2010, Richards made arrangements to fly to Mobile to interview Plaintiff; however, his November 29th flight into Mobile was cancelled. (Id. at 4). During a discussion with his division president that same day, it was recommended that Richards delay seeking a second BMT until "the first of the year, maybe into the second quarter, after Tim Brady had finished or was close to finishing his BMT training." (Id. at 5). Richards conveyed this information to Plaintiff in an email exchange during the first week in December 2010.[22] (Id.) Viewing this undisputed evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has not cast sufficient doubt on Orkin's proffered nondiscriminatory reasons for rejecting her for the Atlantic Commercial trainee position so as to create a dispute of material fact on this issue.

---

[22] In an email sent to Plaintiff on December 4, 2010 (Doc. 91-15), Richards stated:

> I was disappointing [sic] that we did not get a chance to meet.  I did speak with Freeman late yesterday about you and moving forward his suggestion was to wait until after the end of the year. I have one BMT now in the program and because of budgets and realignment in the region I will not be able to support 2 until next year after the first quarter or maybe towards the end of the second.  If your plans change please let me know but as of now I must wait until I can afford the extra position. Let[']s stay in touch and revisit this in March[.] [T]hank you for your patience and understanding.

Accordingly, Defendants' motion for partial summary judgment on the Atlantic Commercial Title VII-promotion claim is **GRANTED**.

### (d). Mid-South Region (Tennessee)

Plaintiff also claims that in the fall of 2010, she made Orkin aware that she was interested in any open branch manager trainee positions in Tennessee and that they rejected her for one such unposted position. (Doc. 105 at 19). Orkin counters that there was no such position in Tennessee in the fall of 2010; thus, Plaintiff has failed to establish a *prima facie* case of discrimination. (Doc. 121 at 11-12).

In support of its argument, Orkin points to evidence that in December of 2010, Plaintiff told Larry Black, the human resources manager for the South Central division, that she was "open to South Carolina, North Carolina, Tennessee, Missouri, just about anywhere middle US."[23]   (Doc. 91-19 at 3; Doc. 92-12 at 8).   In response, Black sent an email on December 6, 2010, to Mid-South region manager Mike Jones (who had a branch in Memphis, Tennessee) notifying Jones of Deneau's interest anywhere in their division.   Jones replied that he was "full

---

[23] Black testified that he initially believed that Plaintiff was only interested in positions in the Carolinas or Virginia, and it was not until Plaintiff sent him the email in December 2010 that he knew of Plaintiff's interest in Tennessee. (Doc. 92-12 at 6, 8).

with BMT's and [had] another in the wings already." (Doc. 91-20 at 1-2; Doc. 92-11 at 11, 31; Doc. 100 at 12).

In support of her allegation that she was rejected for an unposted position in Tennessee, Plaintiff points to Black's deposition testimony in which he was asked, "[a]re you aware of a *potential vacancy* that occurred during that period of time for BMT in Tennessee that Ms. Deneau might have been applying for," and he responded "[y]es." (Doc. 92-11 at 18)(emphasis added). Black was then asked, "[w]hich one was that," and he responded, "I don't know the specific location" or who filled it. (Id.). However, later in his deposition, and in his affidavit, Black clarifies that in December 2010, when he realized that Plaintiff was interested in Tennessee, he reached out to Mike Jones, whose region included Memphis, the only Tennessee branch within their division, about potential vacancies. In response, Jones reported that he was "full with BMT's and [had] another in the wings already." (Doc. 91-20 at 1-2). This undisputed evidence refutes Plaintiff's assertion that during the period in question, there was a vacant position in Tennessee, and it constitutes a legitimate, nondiscriminatory reason that Plaintiff was not given a position in Tennessee. Because Plaintiff has failed to rebut Orkin's legitimate, nondiscriminatory reason for not giving her a position in Tennessee, Defendants' motion for partial summary judgment on

Plaintiff's Mid-South region (Tennessee) Title VII-promotion claim is **GRANTED**.

### 4. **Plaintiff's Title VII-Termination/Retaliation Claim (Second Cause of Action): No Prima Facie Case and Legitimate, Non-Discriminatory Reasons for Termination**

Next, Orkin asserts that it is entitled to summary judgment on Plaintiff's Title VII-retaliation claim (Second Cause of Action) because Plaintiff has failed to establish a *prima facie* case of discrimination with respect to this claim and has failed to rebut Orkin's legitimate, nondiscriminatory reasons for terminating Plaintiff.[24]  (Doc. 100 at 30-32).  In her amended complaint, Plaintiff alleges that Orkin retaliated against her in violation of Title VII by terminating her employment "[a]fter [she] complain[ed] about sex discrimination to management." (Doc. 34 at 6).  Specifically, Plaintiff argues in her opposition to Orkin's motion for partial summary judgment that on December 16, 2010, she posted the following comment on her Facebook page: "anyone know a good EEOC lawyer?  need one now." (Doc. 105 at 21; Doc. 105-1 at 3, 5-6).  Plaintiff points to evidence that Frank Goodwin, the Mobile branch manager at the time of her termination, testified that he saw the comment on

---

[24] Orkin also argues that if Plaintiff attempts to add another Title VII claim for termination based on her sex, it is entitled to summary judgment on that claim as well.  (Doc. 100 at 33). Because there is no such claim before the Court, the Court need not address that argument.

Plaintiff's Facebook page and faxed it to Larry Black, the division human resources manager. (Doc. 92-21 at 40). In his deposition, Goodwin testified that he spoke with either Black or Thomas, the region manager, about the Facebook page, and while he could not recall the date of the conversation, he thought it occurred *before* Plaintiff was terminated. (Id.).

According to Plaintiff, Thomas and Black made the decision to terminate her on December 21, 2010, less than a week *after* she posted the comment on Facebook. (Doc. 105 at 21). Plaintiff also points to an email dated December 21, 2010 from Thomas to Black. In the email, Thomas advises that Plaintiff is out sick, that she is expected to be back in the office the next day, and that they would "terminate her tomorrow."[25] (Doc. 105-12 at 1). Plaintiff was absent from work the following day as well, and Thomas effected her termination over the telephone on December 23, 2010. (Doc. 92-33 at 31). According to Plaintiff, this evidence establishes that she was terminated based on the comment that she "needed a good EEOC lawyer" which was posted to her Facebook page.

---

[25] As noted above, Plaintiff also claims that she made informal complaints to her branch manager, Frank Goodwin, on numerous occasions in October and November of 2010, telling Goodwin that she believed that she was being denied promotion opportunities because she was a female. (Doc. 105-1 at 3). However, there is no evidence, and Plaintiff does not allege, that Thomas or Black were aware of those complaints prior to terminating her.

In support of its motion for summary judgment on this claim, Orkin admits that it took adverse action against Plaintiff, and it assumes, for purposes of the motion, that Plaintiff engaged in statutorily protected conduct by stating on her Facebook page that she needed "a good EEOC lawyer." (Doc. 100 at 30). However, Orkin argues that Plaintiff cannot establish a *prima facie* case because there is no evidence of a causal link between the supposedly protected activity (her Facebook comment) and her termination. (Id.).

To establish a prima facie case of retaliation, the plaintiff must establish that she engaged in statutorily protected conduct; that she suffered an adverse employment action; and finally, that the adverse action was causally related to the protected expression." Scalone v. Home Depot U.S.A., Inc., 280 Fed. Appx. 905, 908 (11th Cir. 2008) (unpublished) (citations omitted). Courts "construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated." Id. (citing Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)). "This element is satisfied if the plaintiff provides 'sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action.'" Id. (citations omitted).

43

As set forth above, Plaintiff has presented evidence that she was terminated less than a week after she posted the comment on Facebook.  Furthermore, Orkin acknowledges that Thomas and Black, the decision makers, were aware of Plaintiff's Facebook posting before she was terminated.  (Doc. 92-21 at 40; Doc. 92-34 at 9).  Based on the close temporal proximity between Orkin learning of the Facebook comment and Plaintiff's termination, the Court finds that Plaintiff has established a *prima facie* case of retaliation.

Defendant argues that assuming *arguendo* that Plaintiff has established a *prima facie* case of retaliation, it is still entitled to partial summary judgment on this claim because Plaintiff has not established that Orkin's legitimate, nondiscriminatory reasons for terminating her are pretexts for retaliation.  It is undisputed that following an audit of the Mobile branch in January 2010,[26] Plaintiff received a written disciplinary reprimand (referred to as a "Coaching and Counseling" letter), after it was discovered that Plaintiff had been working unauthorized overtime, had improperly used her sick

---

[26] Thomas testified that the January 2010 audit was conducted after headquarters received an anonymous complaint on its hotline concerning improper dealings in the Mobile branch by Plaintiff, the branch manager at that time, Jason Breakfield, and the service manager Boby Nagy.  (Doc. 92-34 at 2).

and vacation days to increase her pay,[27] had made payroll mistakes, and had violated the petty cash policies. (Doc. 92-34 at 2-3; Doc. 91-25). The "Coaching and Counseling" letter expressly prohibited Plaintiff from any further violation of these policies and warned Plaintiff that she must "adhere to the expected level of performance/conduct as outlined above or further disciplinary action will be taken up to and including job termination." (Doc. 91-25 at 1; Doc. 92-34 at 3-4). Plaintiff was expressly advised that her overtime had to be approved by region management and the branch manager. (Id.)

As noted *supra*, in December 2010, the Mobile branch underwent a second audit because the branch was slated to be reassigned to another region.[28] (Doc. 92-33 at 29). The division auditor, Donna Orr, began her audit on December 13, 2010 and she communicated with region manager James Earl Thomas while the audit was ongoing. (Doc. 98-3 at 3). In the initial phase, Orr discovered that Plaintiff was repeating the same

---

[27] In his declaration, Thomas explained: "[f]or example, she worked 6.25 hours on September 18, 2009, and also took 4 hours of sick time, so that she was paid for 10.25 hours that day, when she should only have taken 1.75 hours of sick time to make an 8 hour day, and been paid for 8 hours." (Doc. 92-34 at 2-3). "On November 4 she worked 6 hours with 4 hours vacation and received a total of 10 hours pay." (Id.).

[28] The auditor, Donna Orr, testified that the second audit was occasioned by the impending transfer of the Mobile branch to another region. (Doc. 92-26 at 8).

violations regarding sick and vacation time and overtime for which she had been counseled in January 2010.  (Id.; Doc. 92-34 at 6).

In addition, Orr found that on several occasions in one month, Plaintiff had failed to make daily deposits as required by company policy.  (Doc. 92-34 at 6-7).  When Orr reported this information to her manager, Elaine Cole, she was directed to expand her deposit audit to include the entire year.  (Doc. 98-3 at 3).  As a result, Orr discovered that Plaintiff had failed to make daily deposits on sixty-nine occasions in one year.  (Id.).  Upon receiving Orr's report, Thomas consulted with Larry Black, the division human resources manager, and made the decision to terminate Plaintiff's employment.  (Doc. 92-33 at 22-24).  Thomas traveled to Mobile on December 22, 2010 to effectuate Plaintiff's termination.  However, Plaintiff had called in sick on December 21st and failed to appear for work on December 22nd as well.  (Doc. 92-12 at 11).  Thus, Thomas effected Plaintiff's termination over the telephone on December 23, 2010.  (Id.; Doc. 92-33 at 31).

Thomas testified that he decided to terminate Plaintiff because she missed sixty-nine deposits in 2010 and because she continued to violate the policy against working unauthorized overtime after being warned to cease that practice eleven months earlier in January 2010.  (Doc. 91-35; Doc. 92-33 at 34; Doc.

46

92-34 at 7).   According to Thomas, "[e]ach one was a separate and independent reason for her termination.   I would have terminated her for either one."  (Doc. 92-34 at 7).

The reasons proffered by Orkin are clearly ones that might motivate a reasonable employer to terminate an employee.   Where as here, the employer has proffered legitimate, nondiscriminatory reasons for its actions, then the presumption of retaliation raised by the plaintiff's *prima facie* case is rebutted, and thus disappears.   Smith v. Lockheed-Martin Corp., 644 F. 3d 1321, 1325-26 (11th Cir. 2011).   At this juncture, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.   Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

> [F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.   No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal law] does not interfere.   Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.

Id. (citations and internal quotation marks omitted).

In an effort to establish pretext, Plaintiff argues that there are numerous reasons for not making daily deposits, such as when the branch manager is not at work, or money is received after the bank is closed. Plaintiff asserts that no one asked her for an explanation as to whey she failed to make the deposits at issue. (Doc. 105 at 24). Plaintiff also intimates that the branch manager is ultimately responsible for the branch and bore some responsibility for the missed deposits; yet, he was not disciplined. With respect to the overtime violation, Plaintiff argues that Jennifer Naquin, a 30(b)(6) designee for Orkin, acknowledged that she did not know of anyone else in her region who had been fired for working overtime. (Doc. 92-24 at 7). Plaintiff also once again contends that it was the branch manager's responsibility, as opposed to her responsibility, to secure approval for her overtime.

Based on the record before the Court, the undersigned finds that Plaintiff's contentions fail to establish that Orkin's proffered reasons are false and that the real reason for her termination was impermissible retaliation. First of all, Plaintiff has presented no evidence which suggests that the audits were conducted in order to single out her work for close scrutiny, or that Orr's audit findings were incorrect. Second, Plaintiff acknowledges that she violated company policy with respect to both overtime and deposits. Third, while Plaintiff

48

argues that the branch manager bore some of the blame for the missed deposits, but was not disciplined, she has offered no explanation for her failure to follow Defendant's directives regarding overtime. The initial audit revealed that Plaintiff was working unauthorized overtime and that she was improperly utilizing sick leave and vacation to claim overtime. Because of the seriousness of the violation, Plaintiff was issued a written discipline, and the region manager and branch manager met with her regarding the improper behavior. Plaintiff was expressly advised that going forward, she was to secure approval from region management and her branch manager before working any overtime. She was also cautioned that failure to comply with management's directive could lead to further discipline including termination. Notwithstanding, less than a year later, the December 2010 audit revealed that she was still using sick and vacation time to improperly claim overtime, and that she was working overtime without approval. While Plaintiff claims that she had a good reason for working overtime, she has failed to offer any reason for failing to secure approval as directed.

Moreover, the fact that Plaintiff claims that other employees were permitted to work overtime, but she was not, misses the point. As noted, there is no evidence that the January 2010 audit identified other branch employees who were engaged in the same improper conduct as Plaintiff. Further,

Plaintiff admits that she never sought regional management approval for any overtime. Having never sought approval for overtime, Plaintiff cannot demonstrate that she was improperly denied overtime while other similarly situated branch employees were permitted to work overtime. In sum, Plaintiff has failed to establish that Defendant's proffered reasons for Plaintiff's termination is pretext for retaliation.

Because Plaintiff's evidence is not sufficient for a reasonable factfinder to conclude that Orkin's proffered nondiscriminatory reasons for terminating her employment were mere pretext for retaliation, Defendants' motion for summary judgment on Plaintiff's Title VII-retaliation claim (Second Cause of Action) is **GRANTED**.[29]

### 5. Plaintiff's State Law Defamation Claim (Fourth Cause of Action

In her Amended Complaint, Plaintiff alleges that Defendants Orkin, Goodwin, and Mayfield-Duke published false and defamatory statements about her to potential employers, thereby causing her to suffer damages including loss of employment and wages (Fourth Cause of Action). (Doc. 34 at 8-9). Plaintiff argues in her opposition to Defendants' motion for partial summary judgment

---

[29] Having so found, the Court need not address the parties' arguments related to Thomas' after-acquired knowledge of Plaintiff's alleged violation of company policy regarding possession of a gun on work premises. (Doc. 100 at 31; Doc. 105 at 27).

that after she was terminated, Defendant Goodwin, her former branch manager, and Defendant Mayfield-Duke, her replacement as office manager, told potential employers when they called for references that Plaintiff was "lazy, incompetent, and a rule-breaker." (Doc. 105 at 28). Plaintiff testified that Mayfield-Duke's husband and Mayfield-Duke's son-in-law told her that Mayfield-Duke and Goodwin had "thought it was hilarious for people to call and ask for a reference for [Plaintiff]," and they would tell prospective employers that Deneau was "lazy, incompetent and a rule breaker."[30]  (Doc. 92-15 at 53). Plaintiff admits that she does not know of any prospective employer who may have called and been given this false information by Defendants. (Id.).

Defendants Orkin, Goodwin, and Mayfield-Duke argue that they are entitled to partial summary judgment on Plaintiff's defamation claim because Plaintiff cannot prove that any false and defamatory statement about her was ever published to an individual causing her to suffer special damages as a result of the alleged defamation. (Doc. 100 at 33-34). The Court agrees.

As Plaintiff states, in order to establish a *prima facie* case of defamation, she must show:

---

[30] In his deposition, Mayfield-Duke's husband denied ever telling Plaintiff that his wife or Goodwin were giving her bad references. (Doc. 92-17 at 5-6, 9-10).

> [1] that the defendant was at least
> negligent [2] in publishing [3] a false and
> defamatory statement to another [4]
> concerning the plaintiff, [5] which is
> either actionable without having to prove
> special harm (actionable per se) or
> actionable upon allegations and proof of
> special harm (actionable per quod).

Ex parte Crawford Broadcasting Co., 904 So. 2d 221, 225 (Ala. 2004) (citations omitted).

The specific type of defamation alleged in this case is slander. "Generally, in slander there must be an oral communication of a defamatory matter to a third person." Anderton v. Gentry, 577 So. 2d 1261, 1263 (Ala. 1991) (citations omitted).

> There are two types of slander, that is,
> slander per se and slander per quod.
> Slander per se is actionable if it imputes
> to the plaintiff an indictable offense
> involving infamy or moral turpitude. Lewis
> v. Ritch, 417 So. 2d 210 (Ala. Civ. App.
> 1982). Damage is implied by law when spoken
> words are found to be slander per se.
> Slander per quod is a communication to a
> third person of a defamatory statement
> subjecting the plaintiff to disgrace,
> ridicule, odium, or contempt although not
> imputing the commission of a crime involving
> infamy or moral turpitude.

Id. The parties agree that this case involves defamation by slander *per quod* (requiring proof of special damages). (Doc. 105 at 29; Doc. 100 at 34). "Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, and the general rule is that they are

52

limited to 'material loss capable of being measured in money.'"
Casey v. McConnell, 975 So. 2d 384, 390 (Ala. Civ. App. 2007)
(citations omitted).

Assuming that the other elements of Plaintiff's *prima facie*
case are met, Plaintiff admits that she does not know of any
prospective employer who might have called Defendants for a
reference or who might otherwise have been told by Defendants
the false and defamatory statements alleged. (Doc. 92-15 at
53). Moreover, because this case requires proof of special
damages, even if Defendants had made the alleged defamatory
remarks to Mayfield-Duke's husband or son-in-law, Plaintiff does
not allege that publication to those individuals caused her to
suffer any special damages. Consequently, she cannot prove that
Defendants published a false and defamatory statement about her
to another person that resulted in her suffering special damages
(such as lost wages), which is essential to proving her *prima
facie* case. Because Plaintiff has not presented sufficient
evidence to justify submitting her defamation claim to a jury,
Defendants' motion for partial summary judgment on Plaintiff's
state law defamation claim is **GRANTED**.

## III. Conclusion

For the reasons set forth herein, it is **ORDERED** that
Plaintiff's motion for partial summary judgment is **DENIED**, and
Defendants' motion for partial summary judgment is **GRANTED** as

53

follows: Plaintiff's Title VII claims against *individual* Defendants Goodwin and Mayfield-Duke are dismissed; Plaintiff's Title VII promotion claims (First Cause of Action) are dismissed; Plaintiff's Title VII retaliation claim (Second Cause of Action) is dismissed; and Plaintiff's state law defamation claim (Fourth Cause of Action) is dismissed. The only issue remaining for trial is Plaintiff's claim alleging violations of the Fair Labor Standards Act (Third Cause of Action).

**DONE** and **ORDERED** this the **20th** day of **May, 2013.**

/s/ SONJA F. BIVINS
UNITED STATES MAGISTRATE JUDGE